UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
J&J SPORTS PRODUCTIONS, INC.,

              Plaintiff,

- against -

PORT RICHMOND EMPORIUM CORP.
and AHMED A. AZIZ,

              Defendants.
---------------------------------------------------X

**MEMORANDUM
AND    ORDER**

12 CV 4926 (CLP)

On October 3, 2012, plaintiff J&J Sports Productions, Inc. ("J&J" or "plaintiff") commenced this suit against defendants Port Richmond Emporium Corp. ("Port Richmond" or the "corporate defendant") and Ahmed A. Aziz ("Aziz" or "defendant"), alleging a violation of the Communications Act of 1934, 47 U.S.C. §§ 553 and 605. Plaintiff alleges that defendants infringed on plaintiff's exclusive license to show the September 17, 2011 boxing match between Floyd Mayweather, Jr. and Victor Ortiz ("the Event"). (Compl.[1] ¶ 7).

On December 13, 2012, the undersigned held an initial conference with the parties. At that time, the Court determined that although Mr. Aziz could represent himself pro se, Port Richmond, a corporation, could not proceed pro se. The Court Ordered Port Richmond to either find counsel or face default judgment. Port Richmond failed to obtain counsel, and on March 20, 2013, plaintiff requested a certificate of default against Port Richmond. On March 22, 2013, plaintiff filed a motion for default judgment. The Honorable Dora L. Irizarry entered a default judgment against the corporate defendant on March 25, 2013 and referred the matter to the

---

[1]Citations to "Compl." refer to plaintiff's Complaint, filed October 3, 2012.

1

undersigned for an inquest as to damages and attorneys' fees.

Discovery proceeded with the individual defendant, Mr. Aziz, and on September 19, 2013, the parties consented to a bench trial before the undersigned, which took place on November 14, 2013. Plaintiff seeks $31,342.50 in damages, representing $10,447.50 in actual damages, with enhanced damages calculated by increasing actual damages by a factor of three to account for defendants' willfulness. (Proposed Joint Pre-Trial Order ("Pre-Trial Order") at 4-6).

Having heard the testimony and considering the evidence and arguments presented by the parties, this Court finds in favor of defendant for the reasons set forth below.

## FACTUAL BACKGROUND

During the November 14, 2013 trial, plaintiff called one witness, Kevin O'Connor, an investigator retained by J&J, who authenticated certain photographs of Port Richmond, taken on the night of the Event. (See Pl.'s Ex. 3(a)-(d)). In addition, plaintiff introduced into evidence its rate sheets, setting forth the rates charged by J&J to commercial entities contracting for the rights to broadcast the Event. (See Pl.'s Ex. 1).

Defendant Aziz, proceeding pro se, testified on his own behalf, and called James Bibbins, a friend of Aziz's, who testified that he was present in Port Richmond on the night of the Event. Defendant also introduced into evidence additional photographs taken by plaintiff's investigator that had not been offered by plaintiff, an affidavit signed by plaintiff's investigator, defendant's DIRECTV account information, and two DIRECTV bills. (Def.'s Ex. A(1)-(5), B, C, D). Following trial, Mr. Aziz, pursuant to the Court's direction, submitted an additional bill from DIRECTV, dated August 31, 2013, which the Court marked as "Def.'s Ex. E."

2

A.   Testimony of Kevin O'Connor

Plaintiff's witness, Kevin O'Connor, testified that he has been an investigator for over 20 years and that in 2011, he was employed as an investigator for J&J Enterprises. (Tr.[2] at 7). In this role, Mr. O'Connor was assigned to visit areas of New York and New Jersey to observe whether bars or other commercial establishments were broadcasting J&J's licensed boxing matches or sporting events without the right to show the events. (Id. at 8). According to Mr. O'Connor, J&J provided its investigators with a list of locations that had paid to show the Event, and, based on that list, Mr. O'Connor sought out only those establishments that had not purchased the commercial broadcast rights for the Event from J&J. (Id. at 8-9).

Mr. O'Connor identified Plaintiff's Exhibit 1 as the rate list for J&J's September 27, 2011 welterweight championship fight between Mayweather and Ortiz, which listed the rates charged by J&J to purchase the right to show the Event; the rates were based on the maximum seating available in the establishment. (Id. at 10). Mr. O'Connor testified that establishments that had not purchased the right to show the Event could show it by running a wire from an outside facility or from an apartment in the building. (Id. at 9-10). On cross-examination, Mr. O'Connor conceded that he received payment for his services depending on the results of his investigation – namely, he was paid whenever he found a facility that was broadcasting a J&J program without permission. (Id. at 27).

On September 17, 2011, plaintiff had exclusive rights to broadcast the Mayweather/Ortiz boxing match. (Pl.'s Ex. 1). Mr. O'Connor testified that on the night of September 17, he sat in

---

[2]Citations to "Tr." refer to the transcript of the trial proceedings, which took place on November 14, 2013.

his car across the street from Port Richmond watching people come in and out, so he decided to "go in and take a look." (Tr. at 12). He described Port Richmond as a club on the second floor of the building, which in plaintiff's photographs appears to be a stand-alone building with windows looking over the street. (Id.; Def.'s Ex. A(3), A(5)). Mr. O'Connor testified that when he entered the second floor bar, a "large [black] fellow" asked O'Connor to pay him $20 to view the Mayweather/Ortiz fight, which he paid. (Tr. at 12, 18). Mr. O'Connor testified that there were a "couple" of pool tables in the bar, and he observed the Event being broadcast on two televisions monitors. (Id. at 13, 20). On cross-examination, defendant challenged the accuracy of O'Connor's recollection, suggesting that there were twelve pool tables in the premises, but O'Connor maintained that there were only "a couple." (Id. at 20). When asked to describe the size of the television sets broadcasting the Event, O'Connor stated that he was "not too good with sizes of televisions," but that there was one that was large and one that was small. (Id. at 26). He did not recall the specific lighting of the bar, but he testified that he knew it was the Event being shown because he saw Mayweather wearing an orange and black outfit, and he recognized the insignia on the ring floor. (Id. at 13, 20).

Mr. O'Connor estimated that there were approximately fifty (50) people in the bar during the time he was there. (Id. at 11). He stated that the majority of the people present were African American, and that some of them were Hispanic. (Id. at 26). He noted that J&J generally charged around $2,200.00 for facilities that could accommodate 50 people. (Id. at 10-11; see also Pl.'s Ex. 1). When questioned about the individual who asked Mr. O'Connor for $20 at the door – who Mr. O'Connor described as "the bouncer" – Mr. O'Connor testified that the individual remained at the door throughout the time Mr. O'Connor was present. (Id. at 15-16).

4

Although Mr. O'Connor saw several people go in and out and speak to the bouncer, he conceded that he could not be sure if the bouncer was collecting money from these other people because the room was dark. (Id. at 15-16, 18-19). When asked about the photographs that he had taken, O'Connor testified that he took photographs as he drove past Port Richmond in his car[3] (see Pl.'s Exs. 3(a)-(c)), but he did not take any photographs of the bouncer, the interior of the bar, or the televisions broadcasting the Event because he wanted to appear unintrusive. (Tr. at 19).

According to Mr. O'Connor, he spent ten to fifteen minutes in the bar before leaving. (Id. at 13). On the way out, the bouncer at the door asked him if he was coming back, to which he responded he would return later. (Id.)

B.  Testimony of Ahmed Aziz

The defendant, Ahmed Aziz, testified that he has owned the building that houses Port Richmond since 1983, and that he opened the bar and pool hall in 1997. (Id. at 28). Mr. Aziz lives in an apartment behind the bar in the same building, but the apartment has a different address – 178 Palmer Avenue. (Id. at 33). Mr. Aziz testified that although his residence is adjacent to the bar, he does not have a residential cable television account; instead, he subscribes to a closed-circuit commercial account from DIRECTV, which he understands to mean that he

---

[3] Although the photographs were clearly taken from a moving vehicle and were extremely blurry, defendant Aziz conceded that the photographs submitted into evidence by plaintiff were of Port Richmond. (See Pl.'s Ex. 3(a)-(c)). However, as Mr. Aziz pointed out, the plaintiff produced additional photographs to him during the course of discovery that were of a different location. (See Def.'s Ex. A(1)-(5)). Not only is it unclear why the investigator could not have slowed his vehicle to take the photographs or taken them as he was parked across the street, watching the "people go[ing] in and out," it also is unclear why plaintiff produced other photographs to Mr. Aziz during discovery that were clearly taken of another location.

orders directly from DIRECTV for service at a commercial private office. (Def.'s Ex. E). Based on the records submitted by Mr. Aziz at trial and in his post-trial submission, the account appears to be a commercial closed-circuit account from DIRECTV. (Tr. at 31, 34; Def.'s Ex. E).

Mr. Aziz testified that he often orders boxing events through DIRECTV to watch with his friends and family after the bar closes to the public at 11:30 p.m. (Tr. at 28). According to Mr. Aziz, on the night of September 17, 2011, he closed the bar to the public early because he was having an end of summer gathering of friends and family, and he ordered the Event from DIRECTV for them to watch. (Id.) His testimony was corroborated by the records that he submitted from DIRECTV. According to his DIRECTV records, Mr. Aziz paid $59.95 to order the Event directly from DIRECTV. (Id. at 32; Def.'s Ex. C). Mr. Aziz testified that there were approximately thirty people in attendance at his gathering, and they were free to go in and out as they wished. Mr. Aziz denied that there was a bouncer present or that anyone was at the door collecting money. (Tr. at 28, 32). Mr. Aziz contradicted Mr. O'Connor's testimony, stating that there was only one black person present, James Bibbins, and that he was there as a friend, helping out around the bar during the party. (Id. at 31).

C.  Testimony of James Bibbins

Mr. Bibbins testified that he is a family friend of Mr. Aziz; the two have known each other for thirty years, since 1980. (Id. at 37-38). Mr. Bibbins testified that although he does not work for Mr. Aziz, Mr. Bibbins helps out when Mr. Aziz has events for friends at the bar. (Id. at 38-39).

Mr. Bibbins testified that on September 17, 2011, he arrived at Port Richmond at noon

and remained there the entire day, until about 4:00 a.m. (Id. at 39). He testified that there were between 35 and 45 people present while the Event was being shown. (Id.) He noted that there were very few African Americans present – only himself and maybe one or two others. (Id. at 39-40). While the Event was being broadcast, Mr. Bibbins said that he was running up and down the stairs to get food from the store below the bar and getting drinks – mostly sodas and beers – for the guests. (Id. at 40). He testified that he was not working as a bouncer that night nor did he ever work as a bouncer at Port Richmond. (Id.) He also denied that he had taken any money from anyone, and he testified that he did not recognize Mr. O'Connor and had never seen him before the trial. (Id.)

## DISCUSSION

Plaintiff brings this claim under the Communications Act of 1934, 47 U.S.C. §§ 605(a) and 553. Section 605(a), provides, inter alia, that "[n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the . . . contents . . . of such intercepted communication to any person," 47 U.S.C. § 605(a)(6). The provision has been held to apply to the interception of cable communications originating as a satellite or radio transmission. See International Cablevision, Inc. v. Sykes, 75 F.3d 123, 131-32 (2d Cir. 1996), cert. denied, 519 U.S. 929 (1996); see also Garden City Boxing Club, Inc. v. Polanco, No. 05 CV 3411, 2006 WL 305458, at *5 (S.D.N.Y. Feb. 7, 2006), aff'd, 228 Fed. App'x 29, 30 (2d Cir. 2007); Entertainment by J & J, Inc. v. Mama Zee Rest. & Catering Servs., Inc., No. 01 CV 3945, 2002 WL 2022522, at *2 (E.D.N.Y. May 21, 2002); Time Warner Cable of New York City v. Taco Rapido Rest., 988 F. Supp. 107, 109 (E.D.N.Y. 1997). Section 553(a) provides similar

7

protection to the interception of communications offered over a cable system.[4] 47 U.S.C. § 553(a)(1).

Section 605 prohibits any person who, "having received any intercepted radio communication . . . [from] divulg[ing] or publish[ing] the existence, contents, substance, purport, effect or meaning of such communication . . . for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a)(6). An exception to this provision applies to the interception of cable programming "for private viewing" so long as the "individual[ ] receiving such programming has obtained authorization for private viewing" under an established marketing system. 47 U.S.C. § 605(b)(2)(B). The statute defines "private viewing" as the "viewing for private use in an individual's dwelling unit by means of equipment, owned or operated by such individual . . . ." 47 U.S.C. § 605(d)(4).

In order to establish a violation of the Communications Act, plaintiff must prove by a preponderance of the evidence that defendant engaged in the unauthorized interception of radio signals or cable communications. In this case, plaintiff alleges, and defendant does not appear to dispute, that J&J had the exclusive rights to license the broadcast of the Event for commercial viewing. It is also undisputed that the Event was displayed in the Port Richmond bar and that defendant did not purchase the right from J&J to publicly broadcast the Event to patrons of Port

---

[4]However, a court is not permitted to grant damages under both statutes for a single illegal transmission. See International Cablevision, Inc. v. Sykes, 997 F.2d 998, 1009 (2d Cir. 1993). Rather, the Second Circuit has stated that where a defendant is found to have violated both statutes, the court should award damages pursuant to Section 605. Id.; see also Garden City Boxing Club, Inc. v. Polanco, 2006 WL 305458, at *5.

8

Richmond.[5]

A.   Unauthorized Interception

In the motion papers submitted in connection with the Motion for Default Judgment, plaintiff's counsel contends that "[i]n order for an unauthorized commercial establishment to receive a broadcast such as the Event, there must be some wrongful action, such as using an unauthorized decoder, obtaining cable service and illegally altering the cable service to bring the signal of the Event into the establishment." (Hooten Aff.[6] ¶ 9). Moreover, plaintiff's counsel asserts: "[i]t is obvious that the Defendant's interception, receipt and broadcast of the Event were not innocent." (Id. ¶ 7).

The caselaw is clear that the use of a "blackbox" to descramble encrypted broadcasts, the use of an illegal cable drop or splice from an adjacent home into a commercial establishment, or the misrepresentation of a commercial establishment as a residence to then purchase a broadcast at residential rates, constitutes an illegal interception or receipt that would violate the statute. See Joe Hand Promotions, Inc. v. Liriano, No. 06 CV 2940, 2007 WL 749681, at *1-3 (E.D.N.Y. Feb. 15, 2007). However, at trial, the only evidence plaintiff presented to prove that defendant

---

[5]Plaintiff would be entitled to enhanced damages if it could establish that a violation was "committed wilfully and for purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. § 605(e)(3)(C)(ii). Here, the Court does not discuss enhanced damages, and therefore any discussion of "commercial purpose" refers only to whether defendant's viewing of the Event was with his family and friends, and therefore recreational, or whether he opened Port Richmond and broadcast the Event for his commercial patrons, which would have been unauthorized. (Def.'s Ex. C, E).

[6]Citations to "Hooten Aff." refer to the Affirmation of Paul J. Hooten, Esq., In Further Support of Judgment By Default, dated March 22, 2013.

9

was illegally intercepting the Event was the testimony of the investigator that "[t]he way I understand it," bars can obtain the Event "either by running a wire of some kind, like a cable wire, and bringing it in from an outside facility . . . [o]r, say, for example, if there's an apartment upstairs, they'll run it right off the apartment upstairs." (Tr. at 10). However, plaintiff offered no credible evidence to demonstrate that defendant intercepted the Event through the use of a blackbox or wire snaked through from the residence, and the investigator offered no testimony, nor was there any other evidence presented, to suggest that any of these methodologies for intercepting the Event had been used in this case.

Instead, in his defense, defendant Aziz contends that he purchased the Event through his commercial account with DIRECTV, which he believed authorized him to view the Event with his friends and family. In support of that defense, Mr. Aziz submitted documentary evidence demonstrating that during the time at issue, he had an account with DIRECTV, Account No. 052296678, that was designated "For Service at: Commercial Private Office," and that was listed at 350 Port Richmond Ave., the address of the Port Richmond bar. (See Def.'s Ex. D, E). The account statement, dated September 28, 2011, for this same commercial account, clearly indicates that Mr. Aziz purchased the right to view the Event on September 17, 2011 from DIRECTV. (Def.'s Ex. C).

Plaintiff J&J did not present any evidence to contradict Aziz's claim that he had the DIRECTV account, or that he purchased the Event from DIRECTV. Although counsel suggested in her oral argument that Aziz had not purchased the "commercial rights" from J&J, she also argued that: "It's . . . our position that as the defendant has his DIRECTV account in his personal name to his apartment, the defendant would have been able to order the fight through

DIRECTV but only to his residence rather than to the establishment." (Tr. at 42). However, apart from counsel's statement, J&J failed to present any evidence to demonstrate that the account was to Mr. Aziz's apartment or was in fact a residential account. Not only does the DIRECTV document clearly state "Commercial Private Office," but when asked the basis for her claim that the DIRECTV account was registered to Mr. Aziz's residence and not the bar, counsel argued that the suite number on the bill was an indication that the account was a residential account. However, while Suite B2 is listed on the bill, plaintiff presented no evidence to support the assertion that this was in fact Mr. Aziz's residence, and not the bar. Indeed, Mr. Aziz testified that his residence, which is in the back and on the side of the building where the bar is located, has a different address altogether – 178 Palmer Avenue. (Id. at 33, 43). Simply looking at a map corroborates Mr. Aziz's testimony that 178 Palmer Avenue is a side entrance to the building at the address 350 Port Richmond Avenue. Furthermore, plaintiff's photographs, although blurry, show that the building is on a corner and that it had a side entrance. (Def.'s Ex. A(3)). Therefore, absent further evidence to support plaintiff's assertion that the commercial DIRECTV account was actually registered to Mr. Aziz's home and not to his business, the Court finds that the statements of counsel alone are not sufficient to prove that Mr. Aziz illegally intercepted the Event.

Based on the evidence presented at trial, the Court finds that the documentary evidence establishes that Mr. Aziz was authorized to view the Event as a result of his purchase of the Event through DIRECTV. Defendant's DIRECTV billing information confirms that Mr. Aziz paid $59.95 for the Event (Def.'s Ex. C), and that the service was not "snaked" from his apartment into the bar, but was a legitimate closed commercial account for use at Port Richmond.

(Def.'s Ex. E).[7] Furthermore, the "commercial," as opposed to "residential" account, is registered to 350 Port Richmond Avenue, which is the address of the bar, and not 178 Palmer Avenue, Mr. Aziz's personal address. (Id.)

Thus, in the absence of any evidence presented by plaintiff to contradict the reasonable inferences to be drawn from the testimony and documents, the Court finds that Mr. Aziz did not violate the statute because his "interception" of the Event was authorized. See Premium Sports Inc. v. Connell, No. 10 CV 3753, 2012 WL 691891, at *3 (S.D.N.Y. Mar. 1, 2012) (granting summary judgment in favor of defendant where the soccer game broadcast on television in Ireland was transmitted to the defendant bar in New York through use of a slingbox, holding that there was no unlawful "interception" by the defendants); see also Cablevision of Michigan, Inc. v. Sports Palace, Inc., 27 F.3d 566, at *4 (6th Cir. 1994) (holding that the fact that a boxing match was shown at a bar by videotape was insufficient to state a violation of the statute even though the match was "divulged" or "published"); Smith v. Cincinnati Post & Times-Star, 475 F.2d 740, 741 (6th Cir. 1973) (holding that Section 605 is violated only when a person "both intercepts and divulges" the communication).

B. Commercial Viewing

J&J takes the position that based on the investigator's testimony, Aziz was broadcasting

---

[7]It would have been helpful had plaintiff presented evidence or testimony from DIRECTV to support plaintiff's assertion that, despite the designation "commercial account," this was actually a residential DIRECTV account. However, given the Court's finding that plaintiff did not carry its burden to show that Mr. Aziz showed the Event to anyone other than friends and family, whether the account was residential or not would not alter the Court's findings. See discussion infra at 16.

the Event to paying customers, which only J&J could have authorized. Even if there is no evidence that Mr. Aziz illegally intercepted the Event, the question is whether Mr. Aziz could nonetheless be held liable because he engaged in more than a "private viewing" of the Event as defined in the statute, and unlawfully broadcast the Event "for his own benefit." 47 U.S.C. § 605(a)(6); 47 U.S.C. § 605(b)(2)(B). Although the decision in Premium Sports Inc. v. Connell suggests that once it is determined that Aziz received the transmission in a lawful fashion, it does not matter to whom Aziz showed the Event, the court in Premium Sports did not directly address this particular question and the opinion does not discuss whether the Event was being broadcast to paying customers of the bar or not. See Premium Sports Inc. v. Connell, 2012 WL 691891, at *3.

Even if J&J is correct and the broadcast of the Event in Port Richmond was a violation of the statute regardless of how Aziz received the Event, the Court finds that plaintiff has failed to prove that Aziz was engaged in more than a private viewing of the Event. Having considered the totality of the evidence presented at trial, the Court finds that plaintiff has failed to carry its burden of proof with respect to the question of whether the Event was being broadcast to anyone other than defendant's friends and family.

As noted, plaintiff has presented nothing to controvert the documentary evidence demonstrating Mr. Aziz's purchase of the Event from DIRECTV, nor has plaintiff submitted any arguments to suggest that this commercial account did not authorize Mr. Aziz to show the Event to friends and family in Port Richmond. The only evidence presented was the testimony of plaintiff's sole witness, Kevin O'Connor, which the Court did not find to be compelling. Mr. O'Connor had a poor memory and could not recall basic facts about the bar. He could not recall

the size of the televisions broadcasting the Event, nor could he recall how many billiard tables were in the location, testifying that there were a "couple" of pool tables there. (Tr. at 20). The Court credits Mr. Aziz's testimony that there were in fact twelve pool tables in the bar. Mr. O'Connor also testified that he did not see the person at the door collect money from anyone else because it was "a dark room, it's very difficult to observe." (Id. at 18). However, when questioned on cross examination as to whether there were lights over each pool table, the witness stated that he could not recall the lights over the tables. When asked, "[c]an't be a dark place if they're all lit up," he responded, "[y]eah, I can't remember." (Id. at 20). Indeed, the photographs taken by Mr. O'Connor of the exterior of the bar suggest that the bar was large, with many lights, a statement confirmed by the testimony of Mr. Aziz and Mr. Bibbins.

Mr. O'Connor's testimony about the people he observed in the bar was also contradicted by the testimony of the other witnesses. He stated that "a lot" of the people in the bar were African American. (Id. at 26). Not only does his report neglect to mention any specific number of African American patrons (see Def.'s Ex. B), but Mr. Aziz and Mr. Bibbins testified that there were only one or two African Americans present that night. (Tr. at 31, 39-40). Moreover, apart from the fact that Mr. O'Connor did not see the person at the door collect money from any other patrons (id. at 18-19), Mr. O'Connor admitted that he did not have proof to corroborate his claim that he paid $20 to anyone. (Id. at 19).

Plaintiff's remaining evidence fails to support Mr. O'Connor's assertion that defendant was engaged in commercial activity at the time the Event was being shown. Apart from Mr. O'Connor's testimony, the only evidence provided by plaintiff that Mr. O'Connor had even been to Port Richmond were three blurry photographs taken from a moving vehicle driving past Port

14

Richmond. (Pl.'s Ex. 3(a)-(c)). Nothing on the photographs themselves indicate that they were actually taken on the night of the Event; the evidence merely demonstrates that the photographs were developed on September 20, 2011, three days after the Event. (Pl.'s Ex. 3(d)). Given Mr. O'Connor's testimony that he sat across the street from Port Richmond for a period of time watching people "going in and coming out, some people coming downstairs for cigarettes" (Tr. at 12), it is unclear why he did not take the photographs during the time his car was stationary. The fact that he could see people well enough to know why they came downstairs suggests that it was light enough to get a decent photograph from where he was sitting. The photographs plaintiff did submit into evidence were so blurry that they were barely useful.

Plaintiff's case would have been strengthened had Mr. O'Connor taken photographs while inside the bar. Although Mr. O'Connor testified that he could not take photographs inside the bar because he wanted to remain "unintrusive" (id. at 19), if in fact the bar was in violation of the law, taking a photograph at that point would have been more than justified. The Court does not understand why Mr. O'Connor needed to appear unintrusive if he had already determined that commercial activity was taking place. Moreover, as Mr. Aziz pointed out, "[e]verybody take [sic] pictures when they come in." (Id. at 19). In an age where people constantly take photographs on their cellular phones or other personal electronic devices, the Court finds it difficult to believe that Mr. O'Connor could not take even one photograph inside the bar.

Even if plaintiff could prove that this account was private and not for commercial showing, the Court finds that plaintiff failed to establish that on this occasion, defendant was showing the Event to paying customers and not to friends and family. Defendant Aziz's testimony, corroborated by Mr. Bibbins, on the other hand, suggests that the gathering was not

15

for a commercial purpose, and therefore unauthorized, but was instead a party for family and friends held after hours. (Id. at 28, 40). While Mr. Aziz may be biased because of his self-interest in the outcome of the trial, plaintiff's only evidence that the Event was held for a commercial purpose was Mr. O'Connor's testimony, which, as noted previously, the Court does not find entirely reliable.

Given that plaintiff failed to satisfy its burden to prove the elements of its claim by a preponderance of the evidence, and given that the Court credits the evidence presented by the defendant that he purchased the Event through his commercial DIRECTV account, the Court finds in favor of defendant Aziz.

## CONCLUSION

For the reasons stated above, the Court finds in favor of defendant Aziz, dismisses plaintiff's claim that Mr. Aziz violated the Communications Act of 1934, and directs the Clerk to enter judgment in favor of Mr. Aziz. The Clerk is further Ordered to send copies of this Memorandum and Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**
Dated: Brooklyn, New York
February 21, 2014

/s/ CHERYL POLLAK
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York